IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

ELIZABETH HOLEWINSKI,       )

           Plaintiff,        )

       vs.        )

COMMISSIONER OF SOCIAL SECURITY    )
ADMINISTRATION,       )

          Defendant,      )

CASE NO.  3:22-CV-00199-JGC

JUDGE JAMES G. CARR
UNITED STATES DISTRICT JUDGE

MAGISTRATE JUDGE
JONATHAN D. GREENBERG

**REPORT AND RECOMMENDATION**

Plaintiff, Elizabeth Holewinski ("Plaintiff" or "Holewinksi"), on behalf of minor A.G., challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

In September 2019, Holewinski filed an application for SSI on A.G.'s behalf, alleging a disability onset date of October 1, 2016, and claiming A.G. was disabled due to severe ADHD, oppositional defiant disorder, and bipolar disorder.  (Transcript ("Tr.") 191, 301, 308.)  The application was denied initially

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

and upon reconsideration, and Holewinski requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 191.)

On January 5, 2021, an ALJ held a hearing, during which A.G. and Holewinski, represented by counsel, testified.  (*Id.*)  On January 27, 2021, the ALJ issued a written decision finding A.G. was not disabled.  (*Id.* at 191-99.)  The ALJ's decision became final on December 8, 2021, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On February 4, 2022, Holewinski filed a Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 9-11.)  Holewinski asserts the following assignments of error:

(1) ALJ's [sic] failed to properly review prior decision granting a closed period of disability (CPOD) based on promising mental health control from newly prescribed lithium, and further failed to properly review lithium efficacy, resulting in Defendant's erroneous determination of "less than marked" limitations and decision is not based on substantial evidence requiring remand pursuant to Sentence 4.

(2) Plaintiff has provided new and material psychiatric evidence, which is new, material and for which there is good cause for not having supplied this evidence to the ALJ was submitted [sic] to the Appeals Council, and also herein to the District Court, for which said evidence supports remand pursuant to Sentence 6. (See attached in Addendum 1, new [sic] medical records).

(Doc. No. 1.)

## II.    EVIDENCE

### A.    Medical Evidence[2]

In 2018, A.G. underwent psychological testing.  (*Id.* at 538.)  Holewinski reported A.G. had "significant problems with aggressive behavior towards adults, other children, animals, and even infants," and that A.G.'s behavior was cyclical, with no problems for one to two months and then one to two weeks

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

of increased aggression.  (*Id.* at 538-39.)  Holewinski stated that during manic periods A.G. will sleep less, wake up earlier, act agitated or anxious, engage in self-harm, and hear voices.  (*Id.* at 539.)  Holewinski reported in general A.G. exhibited a labile mood that quickly went up and down.  (*Id.*)  Holewinski told Jason Drummon, Ph.D., that A.G. had been hospitalized three times for her aggression toward others. (*Id.*)  Holewinski further reported argumentative behavior, tantrums, lying, stealing, struggling with personal boundaries, disruptive behavior, minimal effort in school, staring into space during instruction at school, and varying grades at school.  (*Id.* at 539-40.)

On examination, Dr. Drummond found slight dishevelment and minor body odor, normal speech, euthymic mood, varied affect, pleasant behavior, good interaction, consistent and appropriate eye contact, repeated tongue rolling motion, fidgeting and an inability to sit still, impulsive behaviors, and a need for repeated redirection to which A.G. responded well.  (*Id.* at 540-41.)  Intellectual functioning testing revealed abilities in the low average range, but overall, the evaluation "did not suggest the presence of significant cognitive delays or learning difficulties."  (*Id.* at 541, 544.)  Dr. Drummond diagnosed A.G. with ADHD and Bipolar I disorder, most recent episode manic, moderate.  (*Id.* at 544.)

An unsigned, undated Teacher Questionnaire submitted in 2019 and completed by A.G.'s fourth grade classroom teacher indicated A.G. had no problems in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for herself.  (*Id.* at 524, 527-32.)  The teacher noted no unusual degree of absenteeism and stated it had been unnecessary to implement behavior modification strategies for A.G.  (*Id.* at 528, 530.)  The teacher commented A.G. "was always well behaved."  (*Id.* at 533.)

On August 13, 2019, A.G. saw Wissam Hoteit, M.D., for medication management.  (*Id.* at 651, 657.)  Holewinski reported A.G. had been doing much better since her Lithium dose was increased and that A.G. had been violent, labile, and almost out of control before that.  (*Id.* at 651.)  Holewinski told Dr.

3

Hoteit A.G. was getting better and having occasional outbursts, was sleeping better at night, and had not been sneaking food. (*Id.*) A.G.'s mood had "improved drastically" and A.G. was becoming calm and appropriate, although she continued to have increased anxiety. (*Id.*) Holewinski also reported increased tics recently. (*Id.*) On examination, Dr. Hoteit found A.G. anxious with increased activity, mood swings, and poor attention span and concentration, but also full orientation, no agitation or anhedonia, appropriate behavior, sufficient fund of knowledge, sufficient language, no flight of ideas, no hallucinations, appropriate affect, no memory loss, no paranoia, no pressured speech, and no suicidal ideation. (*Id.* at 655.) Dr. Hoteit noted A.G. had made some progress. (*Id.* at 656.) Dr. Hoteit decreased one of A.G.'s medications to address the tics and continued her other medications. (*Id.*)

On September 29, 2019, A.G. saw Dr. Hoteit for follow up. (*Id.* at 646.) Holewinski reported increased mood problems recently, although only occasional outbursts, and increased problems sleeping at night, which affected A.G.'s mood during the day. (*Id.*) Holewinski told Dr. Hoteit A.G. continued to have increased anxiety. (*Id.*) On examination, Dr. Hoteit found A.G. anxious with increased activity, mood swings, and poor attention span and concentration, but also full orientation, no agitation or anhedonia, appropriate behavior, sufficient fund of knowledge, sufficient language, no flight of ideas, no hallucinations, appropriate affect, no memory loss, no paranoia, no pressured speech, and no suicidal ideation. (*Id.* at 648.) Dr. Hoteit noted A.G. had made some progress. (*Id.* at 649.) Dr. Hoteit adjusted A.G.'s medications. (*Id.* at 650.)

STAR reading and math testing in September 2019, at the beginning of AG's 4th grade school year, yielded findings of 3.4 grade equivalence and 20–36 percentile range and 3.9 grade equivalence and 34-60 percentile range, respectively. (*Id.* at 465-66.)

On October 7, 2019, A.G. saw Dr. Hoteit for follow up. (*Id.* at 639.) Holewinski reported some improvement in A.G.'s mood recently, with occasional outbursts, continued sleep difficulty, which

4

affected A.G.'s mood throughout the day, and increased anxiety.  (*Id.*)  Holewinski told Dr. Hoteit A.G. had not yet started Invega as their insurance would not cover the medication.  (*Id.*)  Dr. Hoteit received authorization from the insurance company and A.G. was to start the medication that week.  (*Id.*)  On examination, Dr. Hoteit found A.G. anxious with increased activity, mood swings, and poor attention span and concentration, but also full orientation, no agitation or anhedonia, appropriate behavior, sufficient fund of knowledge, sufficient language, no flight of ideas, no hallucinations, appropriate affect, no memory loss, no paranoia, no pressured speech, and no suicidal ideation.  (*Id.* at 643.)  Dr. Hoteit noted A.G. had made some progress.  (*Id.* at 644.)  Dr. Hoteit continued A.G.'s medications.  (*Id.*)

On November 21, 2019, A.G. saw Dr. Hoteit for follow up.  (*Id.* at 632.)  Holewinski reported A.G. had occasional outbursts and less problems with sleeping at night, although A.G. continued to have increased anxiety and panic attacks as a result of her father moving in with his girlfriend and her three children.  (*Id.*)  On examination, Dr. Hoteit found A.G. agitated and anxious, with increased activity, mood swings, and poor attention and concentration, but also full orientation, no anhedonia, appropriate behavior, sufficient fund of knowledge, sufficient language, no flight of ideas, no hallucinations, appropriate affect, no memory loss, no paranoia, no pressured speech, and no suicidal ideation.  (*Id.* at 636.)  Dr. Hoteit noted A.G. had made some progress and adjusted A.G.'s medications.  (*Id.* at 637.)

A November 2019 report card showed that AG achieved mostly "3s," defined as "meets grade level standards while achieving independence," and her grades ranged from As to Cs.  (*Id.* at 536-37.)

STAR reading and math testing in January 2020, during A.G.'s fourth grade year, yielded findings of 5.5 grade equivalence and 64–85 percentile range and 5.8 grade equivalence and 79-93 percentile range, respectively.  (*Id.* at 465-66.)

On February 12, 2020, A.G. saw Dr. Hoteit for follow up.  (*Id.* at 622.)  On examination, Dr. Hoteit found A.G. restless with normal speech and language, irritable mood, congruent affect, poor

attention span and concentration, distractibility, concrete and circumstantial thought process, paranoid and obsessive thought processes, auditory and command hallucinations, good fund of knowledge, no cognitive disturbance, full orientation, intact memory, normal fund of knowledge, and poor insight and judgment. (*Id.* at 625-26.)  Dr. Hoteit adjusted A.G.'s medications.  (*Id.* at 628.)

Tracy Freese, LPC, updated A.G.'s care plan later that month.  (*Id.* at 612-17.)

On February 17, 2020, at a visit with Amy Donnelly, APRN, for physical concerns including low blood sugar, Nurse Donnelly noted, "Patient continuously rubbing at her neck causing irritation.  Also contiguously rubbing/wringing hands togrther [sic] when asked questions.  Tremors noted to bilateral hands appear worse with anxious moments."  (*Id.* at 719, 724.)  Nurse Donnelly diagnosed A.G. with hypoglycemia.  (*Id.* at 725.)

A 504 Plan dated March 2020 indicated that A.G. had difficulty with attention and concentration, specifically staying focused on classwork and in testing settings, and may have difficulty completing assignments and tasks, as well as tests, in the time provided by her teacher.  (*Id.* at 458.)  As testing showed A.G.'s working memory was in the borderline delayed or impaired range, she would benefit from having a scribe during testing, as well as small groups, extended time, and frequent breaks.  (*Id.* at 459.)  Accommodations consisted of preferential seating in class, providing clear and consistent directions and expectations of work, small group settings, and frequent breaks.  (*Id.* at 460-61.)  The plan did not mention any social or behavioral issues.  (*Id.* at 458-62.)

On April 20, 2020, A.G. saw Dr. Hoteit for follow up.  (*Id.* at 708.)  Holewinski reported A.G.'s mood was okay, and she had been "mostly under control without being violent and labile."  (*Id.*)  Holewinski told Dr. Hoteit that A.G. had been having less outbursts and was sleeping better at night, although A.G. continued to have increased anxiety as a result of changes in her home environment caused

6

by the COVID-19 pandemic.  (*Id.* at 708-09.)  Holewinski denied auditory command hallucinations and delusions.  (*Id.* at 709.)  Dr. Hoteit continued A.G.'s medications.  (*Id.*)

On June 15, 2020, A.G. saw Dr. Hoteit for follow up.  (*Id.* at 618.)  Holewinski reported A.G.'s mood was okay, although she had had some "recent deterioration," and while her mood had been largely under control, A.G. had been "somewhat labile recently."  (*Id.*)  Holewinski told Dr. Hoteit A.G. had been having more outbursts and was more difficult to redirect, although she had been sleeping better at night.  (*Id.*)  Holewinski reported A.G. continued to have increased anxiety as a result of spending more time at her dad's house.  (*Id.*)  Holewinski told Dr. Hoteit A.G. endorsed auditory command hallucinations, but Holewinski thought A.G. was responding to internal stimuli and was working with her therapist weekly to resolve the issue.  (*Id.* at 618-19.)  Dr. Hoteit continued A.G.'s medications.  (*Id.* at 619.)

Dr. Hoteit recorded similar findings at A.G.'s appointment on July 13, 2020.  (*Id.* at 704-05.)  Dr. Hoteit started A.G. on Klonopin.  (*Id.* at 705.)

On August 10, 2020, A.G. saw Dr. Hoteit for follow up.  (*Id.* at 702.)  Holewinski reported A.G. "was at her recent baseline with her mood recently on Lithium and Invega," and that A.G. had "been mostly under control" although she had been "somewhat labile recently."  (*Id.*)  While A.G. had been more difficult to redirect, Klonopin helped when Holewinski gave it to A.G.  (*Id.*)  Holewinski told Dr. Hoteit A.G. continued to have outbursts, although she was sleeping better at night.  (*Id.* at 702-03.)  While A.G. continued to have anxiety, Klonopin helped with her racing thoughts.  (*Id.* at 703.)  Holewinski denied any auditory command hallucinations.  (*Id.*)  Dr. Hoteit continued A.G.'s medications.  (*Id.*)

On September 3, 2020, A.G. saw Dr. Hoteit for follow up.  (*Id.* at 692.)  Holewinski reported some improvement in A.G.'s mood after adjusting Lithium and starting Invega, although A.G. was more out of control, violent, and labile recently.  (*Id.* at 693.)  A.G. was struggling to sleep at night and continued to have anxiety caused by changes in her father's home environment.  (*Id.*)  Holewinski reported A.G.'s

ADHD was improved with her medication, and she was getting all As in school.  (*Id.*)   Holewinski told
Dr. Hoteit A.G. lost her temper often, argued with adults often, defied or refused to comply with adult
requests or rules, blamed her misbehavior on others, and was "often touchy or easily annoyed by others."
(*Id.*)  On examination, Dr. Hoteit found A.G. inattentive with normal language, anxious mood, labile
affect, distractible attention span and concentration, normal thought content and thought process, good
fund of knowledge, no cognitive disturbance, and fair judgment and insight.  (*Id.* at 695-96.)  Dr. Hoteit
prescribed a medication to help with sleep and nightmares and continued A.G.'s other medications.  (*Id.* at
699.)

Dr. Hoteit recorded similar findings at A.G.'s appointment on September 24, 2020, except for
noting reported regular bedwetting issues, and continued A.G.'s medications.  (*Id.* at 685-86.)

On October 19, 2020, A.G. saw Dr. Hoteit for follow up.  (*Id.* at 683.)  Holewinski reported A.G.'s
mood had been declining recently despite her medication, and A.G. had been labile, erratic, cranky,
irritable, moody, angry, and more difficult to redirect, although Klonopin helped when given.  (*Id.* at 683-
84.)  A.G. slept poorly despite her sleep medication.  (*Id.* at 683.)  Holewinski reported A.G. continued to
have outbursts and anxiety.  (*Id.* at 684.)  Dr. Hoteit increased Invega and continued A.G.'s other
medications, including Lithium.  (*Id.*)

On October 26, 2020, A.G. saw LPC Freese for counseling.  (*Id.* at 677.)  Holewinski reported
A.G. was having a harder time at home, especially with her father.  (*Id.* at 678.)  Changes in her father's
living situation without warning had resulted in escalating anger and aggression on A.G.'s part, and A.G.
was upset and confused.  (*Id.*)  Holewinski told Freese medication issues had caused A.G. to go through
withdrawal while Holewinski worked things out with their insurance company.  (*Id.*)  Holewinski further
reported A.G. fighting more with her sister, threatening her sister, increased agitation, loneliness, possible
disassociation, talking to her toys, negative interactions with her younger cousin, making unsafe choices

when playing with her younger cousin, and immaturity.  (*Id.*)  On examination, Freese found A.G. stable with a euthymic/congruent mood, normal thought process/orientation, and normal behavior/functioning. (*Id.* at 677-78.)

On October 28, 2020, A.G. saw Freese for follow up.  (*Id.* at 673.)  Holewinski reported A.G. had had a good day but had a bad day the day before.  (*Id.* at 675.)  Holewinski told Freese A.G. continued to have erratic moods and occasional aggression.  (*Id.*)  Freese discussed coping skills with A.G., and they made a new coping plan.  (*Id.*)  Freese noted A.G. was "open and receptive to all conversation and activities," used her words to express herself, asked for help to modify her coping plan since she did not feel her current one was helping, was responsive to prompts to put down her phone when it became a distraction, was respectful, and interacted well with Freese during the session.  (*Id.*)  On examination, Freese found unremarkable mood/affect, thought process/orientation, behavior/functioning, medical condition, and substance abuse.  (*Id.* at 674.)

On November 4, 2020, A.G. saw Freese for follow up.  (*Id.* at 669.)  A.G. reported feeling tired but that she had had a good day.  (*Id.* at 671.)  A.G. told Freese she had been getting along with her sister and they had played well together throughout the week.  (*Id.*)  A.G. and Freese used a game to help A.G. identify her feelings, thoughts, hopes and dreams, and A.G. communicated well with the therapist during the game.  (*Id.*)  Holewinski reported A.G.'s week had been better, although A.G. continued to fight with her sister.  (*Id.*)  On examination, Freese found unremarkable mood/affect, thought process/orientation, behavior/functioning, medical condition, and substance abuse.  (*Id.* at 670.)

On November 11, 2020, A.G. saw Freese for follow up.  (*Id.* at 665.)  Freese noted the entire family was in the car running errands during the telehealth session, so the connection was dropped often and A.G.'s sister was "very disruptive throughout the session."  (*Id.* at 667.)  Holewinski reported A.G. had had a rough day, although she had had good days in the past week.  (*Id.*)  Holewinski told Freese A.G.

9

continued to struggle with her schoolwork and was talking back daily.  (*Id.*)  Freese noted A.G. was "extremely distracted" during the session and was texting her friends throughout.  (*Id.*)  A.G. began arguing with her mother about the friend she was texting because her mother did not like her.  (*Id.*)  On examination, Freese found unremarkable mood/affect, thought process/orientation, behavior/functioning, medical condition, and substance abuse.  (*Id.* at 666.)

On November 18, 2020, A.G. saw Dr. Hoteit for medication management.  (*Id.* at 663.) Holewinski reported A.G. had been doing better with her current medication regimen.  (*Id.*)  Holewinski told Dr. Hoteit A.G. had been mostly stable, less erratic, less cranky and irritable, less moody and angry with less frequent outbursts, and less anxious.  (*Id.* at 663-64.)  A.G. had been sleeping better on her current sleep medication.  (*Id.*)  Dr. Hoteit increased A.G.'s medication for enuresis and continued her other medications.  (*Id.* at 664.)

That same day, A.G. saw Freese for follow up.  (*Id.* at 659.)  A.G.'s diagnoses consisted of Bipolar I disorder, current or most recent episode manic, with psychotic features, ADHD, and oppositional defiant disorder ("ODD").  (*Id.*)  Holewinski reported A.G. had a rough day and had been aggressive, yelling, and refusing to listen.  (*Id.* at 661.)  A.G. continued to struggle with online school.  (*Id.*)  Freese noted she tried to engage A.G. in conversation but A.G. "appeared restless[] and distracted," argued with her mother, asked to leave the room several times, ignored the therapist, and frequently stared into space.  (*Id.*) Holewinski declined the therapist's offer to engage her and A.G. in a game and expressed concern regarding A.G.'s lack of empathy and aggression toward her sister.  (*Id.*)  Freese noted A.G. was aggressive toward her mother and was more interested in playing the game her mother was playing on her computer than engaging in the session.  (*Id.*)  Freese opined A.G. "was disagreeable throughout the session" and Holewinski was "highly stressed" and "dominated the session."  (*Id.* at 662.)  On

examination, Freese found unremarkable mood/affect, thought process/orientation, behavior/functioning, medical condition, and substance abuse.  (*Id.* at 660.)

An email from A.G.'s school dated December 3, 2020, advised that A.G. had completed "about 79 hours" of online school, though she should have worked approximately 270 hours by that point.  (*Id.* at 456.)  At that time, A.G.'s grades ranged from B to D+.  (*Id.* at 457.)

**B.**  **State Agency Reports**

On January 8, 2020, Paul Tangeman, Ph.D., opined that A.G.'s impairments did not meet or medically equal any listed childhood impairment, nor did her impairments functionally equal any of the listings.  (*Id.* at 303.)  Dr. Tangeman further opined A.G. had less than marked limitation in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for self, and had no limitations in the domains of moving about and manipulating objects and health and physical well-being.  (*Id.* at 303-04.)

On July 16, 2020, on reconsideration, Courtney Zeune, Psy.D., affirmed Dr. Tangeman's findings. (*Id.* at 310-11.)

**C.**  **Hearing Testimony**

During the January 5, 2021 hearing, A.G. testified to the following:

- She likes to draw and play video games during her free time.  (*Id.* at 217.)  She plays video games most of the time.  (*Id.* at 218.)  She knows how to ride a bike.  (*Id.* at 218-19.)  She plays with other kids outside.  (*Id.* at 219.)  She watches TV.  (*Id.*)  Her best friend, Aria, lives in her neighborhood and goes to her school.  (*Id.*)  They are in the same grade.  (*Id.*)  She can make her own peanut butter and jelly sandwiches, get dressed, pick out her clothes, brush her teeth, and brush her hair.  (*Id.* at 219-20.)  She cleans her room and takes out the trash.  (*Id.* at 220.)  Sometimes she needs reminders to do her chores.  (*Id.*)  She has a phone, a smart watch, a school laptop, a music player, and a PS3.  (*Id.* at 221.)  She helps take care of her dog.  (*Id.* at 228.)

- She sometimes has trouble sleeping.  (*Id.* at 221.)  She takes medications for sleep and anxiety.  (*Id.* at 221-22.)  Her medications help her, and she is able to focus.  (*Id.* at 222.)  When she doesn't take her medication, she doesn't feel like herself and she hears voices.  (*Id.*)  Sometimes when she gets really mad, she bangs her head on the

11

wall or punches the wall.  (*Id.* at 230.)  She has thrown things at her mother and sister.  (*Id.* at 231.)  She fights with her sister over video games because they have to share the PS3.  (*Id.*)  One time she fought with her sister and made her bleed.  (*Id.*)  She has a problem with bedwetting, and she is on medication for it.  (*Id.* at 236.)  The medication is helping.  (*Id.*)  Her last accident was two months ago.  (*Id.* at 237.)  Sometimes she scratches her arms, but it is not too bad.  (*Id.* at 239.)  She pulls her hair out sometimes.  (*Id.*)  Sometimes her hands shake when she does not take her medications.  (*Id.* at 242-43.)  Her Lithium is helping her.  (*Id.* at 243.)

- She is getting Bs and Cs in school.  (*Id.* at 224.)  It is harder to go to online school than in person.  (*Id.* at 225.)  Her teachers are not helping her with her work.  (*Id.*)  Her favorite subject is math and her least favorite subject is science.  (*Id.*)  She sometimes has trouble with her homework.  (*Id.* at 226-27.)  She sits with Aria and Paige at lunch.  (*Id.* at 227.)  She gets along well with the teachers at school.  (*Id.*)  She has never been suspended or in trouble at school.  (*Id.*)  She did not get into a fight with a boy at school last year.  (*Id.* at 229-30.)

During the January 5, 2021 hearing, Holewinski testified to the following:

- She disagrees with some of the things A.G. said during the hearing.  (*Id.* at 246.)  A.G. had bedwetting incidents the day before the hearing and the day before that.  (*Id.* at 247.)  The previous weekend, while at her dad's house, A.G. had accidents every night.  (*Id.*)  A.G. became violent at her dad's house, but her dad did not want to give her Klonopin.  (*Id.*)  A.G. ended up getting the medication herself.  (*Id.*)  A.G. hears voices even on her medications, and during manic episodes will hurt herself because the voices tell her to do so.  (*Id.*)  There are holes in the doors and walls of the house from A.G. banging her head on the wall.  (*Id.* at 248.)  Holewinski can tell A.G. is struggling and will have "complete mental breakdowns where she's crying hysterically because [the voices] won't stop."  (*Id.*)  The voices tell A.G. to hurt herself or her sister.  (*Id.*)  A.G. has dislocated Holewinski's shoulder, busted open Holewinski's mouth, and hurt her sister during episodes.  (*Id.*)

- A.G. takes the trash out, although it is an argument.  (*Id.*)  A.G. cleans her room, but Holewinski must be there with her and give her step-by-step instructions.  (*Id.*)  Holewinski has a whiteboard where she assigns certain days to the girls to feed and water the dog, and she must remind A.G. to do it, or it won't get done.  (*Id.*)  A.G. can dress herself, but brushing her teeth is an argument and Holewinski usually brushes them for her.  (*Id.*)  Holewinski has had to forcibly pick up A.G. and put her in the shower because A.G. will go several days without showering or she gets in and rinses off without washing.  (*Id.* at 248-49.)

- Online school is a fight with A.G.  (*Id.* at 249.)  All of her work is complete and up to date.  (*Id.* at 250.)  The lack of hours was only for December.  (*Id.*)  In December, A.G. had a bad manic episode and became violent, and Holewinski could not get her to do anything, let alone schoolwork.  (*Id.*)  A.G. misses school when her sister gets sick, which is often, or when she has to have emergency appointments, or when she is

12

so aggressive that she is not allowed on the bus.  (*Id.* at 250-51.)  Holewinski did not know A.G. had an excessive number of unexcused absences.  (*Id.* at 251.)

- A.G. struggles with responsibility.  (*Id.*)  Her IQ is 78 and she is not where is supposed to be for a 10-year-old.  (*Id.* at 251-52.)  A lot of times, A.G. is out of touch with reality.  (*Id.* at 252.)  A.G. is very good at math, art, and music, but struggles with spelling and writing.  (*Id.* at 253.)  Writing stories and reading comprehension are difficult for her.  (*Id.*)

- A.G. plays by herself a lot because Holewinski cannot trust A.G. to play with her sister.  (*Id.* at 254.)  A.G.'s sister is autistic, has a developmental delay, and has bad scoliosis.  (*Id.*)  Mentally, A.G.'s sister is four years old.  (*Id.*)  A.G. does not understand that and cannot understand when her sister acts like a four-year-old.  (*Id.*)  Holewinski must keep them separated at all times and they are not allowed to play together unless Holewinski is there.  (*Id.*)  A.G. got into an argument with her friend in June.  (*Id.*)  It is hard for her to have a normal childhood and socialize with other kids because no one knows when the switch will flip and she will have an episode.  (*Id.* at 270.)

- A.G. has hand tremors even with her medication.  (*Id.* at 254-55.)  Her doctors are trying to figure out the cause.  (*Id.* at 255.)  The tremors can go from mild to severe quickly.  (*Id.*)  A.G. has dropped cups and dishes because of them.  (*Id.*)

- A.G. steals food in the middle of the night.  (*Id.* at 257.)

- Sometimes A.G. participates in the therapy and some days she is defiant and uncooperative.  (*Id.*)

- The reason A.G. is disabled is that Holewinski never knows when A.G. is going to have an episode or become violent.  (*Id.* at 258.)  Holewinski has had to remove A.G. from public places, cannot take her to certain family members' homes because A.G. has attacked other kids or adults, and cannot take her out because Holewinski doesn't know how A.G. is going to react to other kids or adults.  (*Id.* at 258-59.)  A.G. has more violent days than calm days.  (*Id.* at 259.)  If A.G. is not agitated, she is aggressive.  (*Id.*)  Holewinski cannot afford camps for A.G. to go to in order to improve her functioning because they are not covered by insurance.  (*Id.*)  A.G.'s doctor says A.G. is one of his worst cases.  (*Id.*)  A.G. has crying fits because the voices won't stop.  (*Id.*)  One time A.G. was on a 72-hour psych hold because the voices were telling her to stab her cousin with a pair of scissors.  (*Id.*)

- Lithium seemed like it was helping for the first few months, but then the voices came back and were more aggressive.  (*Id.* at 261.)  A.G. was also more aggressive.  (*Id.*)  The doctor increased A.G.'s Lithium to 300 mg a day, and A.G. kept getting worse.  (*Id.* at 262.)  A.G. is now on 600 mg of Lithium a day and it has not stopped the voices.  (*Id.*)  A.G.'s doctor has tried a lot of different medications, and some of them caused bad side effects.  (*Id.*)  Klonopin helps, but it makes her drowsy and lethargic,

and is to be given on an as needed basis. (*Id.* at 263-64.) A.G. had a four to six week manic period where she was fighting people and damaging property. (*Id.* at 268.)

- In fourth grade, A.G. yelled at a teacher and then disappeared for half an hour and the school couldn't find her. (*Id.* at 264.) Another time, she got into a fight with a couple of other kids and received an in-school suspension. (*Id.* at 264-65.) Sometimes A.G. will zone out in class and get distracted easily, while other times A.G. can be disruptive. (*Id.* at 265.)

- Neighbors called the cops because A.G. attacked her grandmother outside their house, kicking and punching and clawing her. (*Id.* at 266.)

- A.G.'s ADHD medication helps her focus for about four hours and has helped somewhat with her dyslexia baseline. (*Id.* at 268.)

### III.   STANDARD FOR DISABILITY

To qualify for SSI benefits, an individual must demonstrate a disability as defined under the Act. "An individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listings, the Commissioner will assess the functional limitations caused by the impairment. 20 C.F.R. § 416.926a(a). The Commissioner will consider how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5)

14

caring for [ ]self; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled.  20 C.F.R. § 416.926a(d).  To receive SSI benefits, a child recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning.  20 C.F.R. § 416.926a(e)(2)(i).  "Marked" limitation means "more than moderate" but "less than extreme."  20 C.F.R. § 416.926a(e)(2)(i).  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  *Id.*

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation means "more than marked."  20 C.F.R. § 416.926a(e)(3)(I).  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  *Id.*

If an impairment is found to meet, or qualify as the medical or functional equivalent, of a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled.  20 C.F.R. § 416.924(d)(1).

### IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on March **, 2010.  Therefore, she was a school-age child on September 19, 2019, the date application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since September 19, 2019, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: Anxiety disorder; Unspecified mood disorder; Attention deficit hyperactivity disorder (ADHD), combined type;

15

Bipolar I disorder; Dyslexia and alexia; and Oppositional defiant disorder (20 CFR 416.942(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.      The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.      The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since September 19, 2019, the date the application was filed (20 CFR 416.924(a)).

(Tr. 192-98.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec*., 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different

16

conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.**     **Substantial Evidence Supports the ALJ's Determination of A.G.'s Limitations**

In her first assignment of error, Holewinski argues that the "ALJ wrongly states there was [a] prior application which resulted in an 'unfavorable decision,'" when in fact the earlier application resulted in a partially favorable decision.  (Doc. No. 9 at 20.)  Holewinski maintains the "relevant inquiry" is "***whether promise of new medication, Lithium, did the 'trick' to make [A.G.] functional, albeit at less than marked levels of disruption, therefore, denial in current claim herein, is based on substantial evidence?***"  (*Id.* at 20-21) (emphasis in original).  Holewinski argues that a "longitudinal picture" of the evidence shows lithium failed to provide stability and A.G.'s behavior was once again out of control.  (*Id.* at 21.)  Holewinski asserts treatment records support marked limitations in the domains of attending and completing tasks and in interacting and relating to others, which had been found marked in the prior decision.  (*Id.* at 24.)  Holewinski argues the ALJ ignored that A.G.'s lability was uncontrolled, as was her enuresis.  (*Id.* at 25-26.)  Holewinski accuses the ALJ of cherry-picking the record and maintains that little was considered regarding medication side effects.  (*Id.* at 27-28.)  Holewinski also attacks the ALJ's "over-emphasis" on the unsigned, undated teacher questionnaire.  (*Id.* at 29-30.)  Holewinski maintains that "no matter what meds they have had [A.G.] on, baseline is non-functional, and plaintiff's condition is so labile that minimization by ALJ Carey at Tr. 197, is simply not based on substantial evidence."  (*Id.* at 30.)

The Commissioner responds that substantial evidence supports the ALJ's findings that A.G.'s impairments did not functionally equal the Listings.  (Doc. No. 10 at 10.)  The Commissioner argues that "Plaintiff points to no evidence that the ALJ failed to consider, nor does she establish that the evidence considered by the ALJ demands additional restrictions."  (*Id.* at 11.)  Rather, Holewinski "merely disagrees with the ALJ's findings, which is not grounds for remand," and asks the Court to reweigh the evidence in her favor, which the Court may not do.  (*Id.* at 11, 14.)

18

In reply, Holewinski argues the ALJ "completely ignored" the prior decision, and therefore the "ALJ could not compare A.G.'s condition in terms of whether the anticipated improvement occurred, OR whether A.G. was at same [sic] point she was at *when previously found disabled for CPOD.*"  (Doc. No. 11 at 1) (emphasis in original).  Holewinski asserts the ALJ must determine whether *res judicata* applies and whether conditions improved or worsened.  (*Id.* at 2.)  Holewinski maintains the Commissioner misses the point in stating that Holewinski has not identified any evidence the ALJ failed to consider, as "[b]efore the ALJ can consider evidence in this case, first ALJ [sic] must, respectfully, determine whether evidence that had found A.G. to be '*disabled previously*', is of the same level as presented herein."  (*Id.*) (emphasis in original).  Holewinksi argues:

> The fact A.G. had CPOD because Lithium was supposed to be the super medication, *just did not pan out*. ALJ, as A.G. argued, was oblivious to prior "allowance of CPOD" for her; that A.G. was found disabled, rather than "not disabled" as ALJ kept stating. Tr.191 Post decision, Lithium was, in fact, raised yet again, leading to toxicity. Plt Brf 23. This is the connection between prior decision, current claim/decision, the "worsening" and new evidence which A.G. argues, pursuant to Sentence Six, should be included, then reviewed upon Remand. *This argument is completely missed by Defendant, and goes unanswered*, thus *any defense to it is "waived*."

(*Id.* at 3) (emphasis in original).  Holewinski maintains that "Overall, looking at post CPOD/decision and new POD, based on longitudinal review of her psychiatric and medical treatment, A.G. is worsening results [sic] on disability again."  (*Id.* at 5.)

### 1.    Impact of Prior Decision

As Holewinski points out, the ALJ erroneously stated that the prior application for benefits resulted in an unfavorable decision in July 2019. (Tr. 191.)  However, at Step Two, the ALJ explained:

> In the prior decision, the claimant was found to have severe impairments of Anxiety disorder; Unspecified mood disorder; Attention deficit hyperactivity disorder (ADHD), combined type; and Bipolar I disorder (B1A).  The current record shows that these impairments remain severe. Additionally, there is also a new diagnosis of Dyslexia, alexia and

19

> oppositional defiant disorder. *Therefore, AR 98-4(6) does not apply to this finding.*

(*Id.* at 192) (emphasis added).

In *Drummond*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Commissioner of Social Security*, 126 F.3d 837, 842 (6th Cir. 1997) (relying on *Senters v. Sec'y of Health & Human Servs.*, No. 91–5966, 1992 WL 78102 (6th Cir. Apr. 17, 1991) (per curiam). *See also Blankenship v. Comm'r of Soc. Sec.*, 624 F. App'x 419, 425 (6th Cir. 2015). In response, the Commissioner issued AR 98-4(6), which bound ALJs deciding a second disability claim to the prior ALJ's findings "unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding." 1998 WL 283902, at *3.

The Sixth Circuit clarified the scope of *Drummond* in *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018). *Earley* made clear that new regulatory framework for determining disability is a changed circumstance justifying departure from a prior ALJ's ruling, and explicitly stated that because "human health is rarely static. . . . Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have 'actually litigated and resolved' whether a person was disabled at some later date." *Earley,* 893 F.3d at 932-33.

Here, the relevant time frame for purposes of judicial review is September 2019[3] through January 27, 2021. This period post-dates the time frame considered by the previous ALJ when the July 2019 decision was issued. The Sixth Circuit's guidance in *Earley* makes clear that *res judicata* cannot properly be applied to this case, as it covers a different time period than A.G.'s prior application. Holewinski's

---

[3] Under 20 C.F.R. § 416.335, SSI benefits are payable as of the month following the month of application. Therefore, the period at issue begins on September 19, 2019, the date of application, regardless of the alleged onset date.

20

present claim is that A.G. was disabled when she filed her application in September 2019, an issue the ALJ in July 2019 could not have considered.  Therefore, the ALJ properly conducted a *de novo* review of the record.  While Holewinski argues the ALJ "completely ignored" the first administrative law judge's findings (Doc. No. 11 at 1), the ALJ explicitly considered the prior ALJ's findings, and explained she was not bound by *res judicata* because there had been new diagnoses since the prior decision.  (Tr. 192.)  While the ALJ could have discussed the prior ALJ's findings in greater detail throughout the entirety of the decision, it is clear the ALJ considered the prior decision.  A perfect decision is not required.  *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (citations omitted); *see also NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.").

There is no error.

## 2.  Functional Equivalence Analysis

Substantial evidence supports the ALJ's functional equivalence analysis.  In analyzing the testimony of A.G. and Holewinski, as well as the treatment records, the ALJ discussed findings that both supported and undercut findings of disability.  (Tr. 195-98.)  Contrary to Holewinski's assertions, the ALJ explicitly discussed findings of lability in the treatment records while on her medication.  (*Id.* at 196.)  Furthermore, while Holewinski makes much of the fact that the teacher questionnaire was undated and unsigned, the questionnaire states it was completed by A.G.'s classroom teacher, not the guidance counselor (*id.* at 528), and it is the ALJ's duty – not this Court's – to weigh the evidence.  In addition, the ALJ only found the questionnaire partially persuasive as the teacher's finding of no limitations in the functioning domain was undercut by the treatment records, A.G.'s 504 plan, and A.G.'s medications.  (*Id.*

at 198.)  Finally, the opinions of the state agency reviewing sources support the ALJ's decision.  (*Id.* at 301-06, 308-13.)  While Holewinski argues that their opinions are "extremely limited" at best because they were "missing the full picture" with respect to the prior claim (Doc. No. 11 at 4), as explained above, the issue is whether A.G. was disabled beginning in September 2019.  The state agency reviewing sources issued their opinions in January 2020 and July 2020.  (Tr. 301-06, 308-13.)  The ALJ considered the treatment records that post-dated the state agency reviewing sources' opinions.  (*Id.* at 196.)

At bottom, Holewinski's argument is nothing more than a request for this Court to reweigh the evidence, which it cannot do.  While Holewinski interprets the records differently, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

There is no error.

## B.  Standard for Sentence Six Remand is Not Met

Insofar as the Court can understand Holewinski's disjointed argument, it appears her Sentence Six remand argument concerns two groups of records: (1) Zepf Center records that predated the ALJ's decision but were omitted from the records provided by Zepf Center to counsel, despite being requested timely; and (2) hospital and Zepf Center records that post-date the ALJ's decision by six months to over a year.  (Doc. No. 9 at 24-25, 30-36.)

Regarding the set of treatment records that pre-date the ALJ's decision, Holewinski asserts:

> Counsel had good cause for not having submitted omitted records by Zepf, as these were requested timely, and Zepf had only partially

22

submitted records to us. We had no control whether records are held back. The more complete records were submitted to AC. Review of more complete Zepf records *supports counsel's position plaintiff has marked limitations in domains of attending and completing tasks and in interacting and relating to others-which counsel argues, should have resulted in a finding of disabled.*

(*Id.* at 24-25) (emphasis in original).

Regarding the second set of records, again as far as the Court can understand Holewinski's argument, Holewinski maintains the records post-dating the ALJ's decision are new and material, good cause has been shown, and they relate back to the period at issue. (*Id.* at 33-35.)

Finally, presumably with respect to both sets of documents, Holewinski argues: "They were unavailable prior to ALJ decision, some got to AC, but critical records were in process of receipt, and AC knew this, but nevertheless, rendered their decision without them. They are new and material under the previously mentioned case law set forth above." (*Id.* at 35.)

The Commissioner fails to address the records that pre-date the ALJ's decision. (Doc. No. 10.) With respect to the evidence post-dating the decision, the Commissioner argues this evidence is not material as it does not relate back to the period at issue. (*Id.* at 16.) The Commissioner asserts that even if the records "somehow did relate back" to the relevant period, Holewinski fails to show a reasonable probability that the ALJ would have reached a different result regarding the relevant period. (*Id.*) To the extent the evidence shows a worsening of A.G.'s condition, the appropriate recourse is to file a new claim, not seek reconsideration of the old one. (*Id.* at 16-17.)

The Sixth Circuit has repeatedly held "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a claimant shows the evidence satisfies the standard set forth in sentence six of 42 U.S.C. § 405(g). *Id. See also Cline v. Comm'r of Soc. Sec.*, 96

23

F.3d 146, 148 (6th Cir.1996); *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 717 (6th Cir. 2013) (stating that "we view newly submitted evidence only to determine whether it meets the requirements for sentence-six remand").  Sentence six provides that:

> The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'"  *Foster*, 279 F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626).  Evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'"  *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)).  *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (noting that evidence is "material" if it "would likely change the Commissioner's decision."); *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 725 (6th Cir. 2012) (same).  Evidence is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition after the administrative hearing.  *See Prater v. Comm'r of Soc. Sec.*, 235 F. Supp. 3d 876, 880 (N.D. Ohio 2017).  *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition"); *Deloge v. Comm'r of Soc. Sec.*, 540 F. App'x 517, 519-20 at *3 (6th Cir. 2013) (same).  Similarly, "[t]o be material,

the evidence must relate to the time period at issue – i.e., from the alleged onset date through the date of the ALJ's decision." *Malanowksi v. Comm'r of Soc. Sec.*, No. 1:13CV763, 2014 WL 2593960, at \*10 (N.D. Ohio June 10, 2014) (citing *Casey v. Sec'y of Helath & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Wyatt v. Sec'y of Health & Human Servs.,* 974 F.2d 680, 685 (6th Cir. 1992)).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter*, 479 F. App'x at 725. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the clamant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)). This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 479 F. App'x at 725. *See also Bass*, 499 F.3d at 513.

The burden of showing that a remand is appropriate is on the claimant. *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). When a district court grants remand pursuant to sentence six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand[s] for further fact-finding." *Courter*, 479 F. App'x at 725. *See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). Under these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also Melkonyan*, 501 U.S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

Regarding the evidence that pre-dates the ALJ's decision, this evidence is not "new" as it was in existence at the time of the administrative proceeding. *Foster*, 279 F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626). Therefore, a sentence six remand is inappropriate for consideration of these records. *See Bialo v. Comm'r of Soc. Sec.*, Case No. 17-12384, 2019 WL 1349609, at *2 (E.D. Mich. Mar. 26, 2019).[4]

Regarding the evidence that post-dates the ALJ's decision, Holewinski has not demonstrated a sentence six remand is appropriate. This evidence is "new," as it post-dates both the administrative hearing and the ALJ decision. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 734 (N.D. Ohio June 14, 2005). However, Holewinski must also demonstrate the materiality of this evidence. This evidence post-dates the period at issue – September 19, 2019 (the application date) through January 27, 2021 (the date of decision). Holewinski must show these records pertain to A.G.'s condition before the ALJ's decision. *See Malanowski*, 2014 WL 2593960, at *10.

The Court agrees with the Commissioner that these records show a deterioration or change in A.G.'s condition after the relevant time period. With respect to the first and second sets of records that concern lithium toxicity (Doc. Nos. 9-1, 9-2), Holewinski admits that these records do not relate back to the relevant period. (Doc. No. 11 at 8.) Regarding the third set of records concerning an in-patient hospitalization in December 2021 as a result of suicidal ideation, the records state that an argument at Christmas precipitated A.G.'s deterioration. (Doc. No. 9-3.) The fourth set of records are treatment notes from the Zepf Center that date from December 17, 2021, to April 4, 2022. (Doc. No. 9-4.) These records

---

[4] Holewinski makes no argument that the absence of these records deprived her of a full and fair hearing, and the Court shall not make such an argument for her. *Cf. Bialo v. Comm'r of Soc. Sec.*, Case No. 17-12384, 2019 WL 2218798, at *5 (E.D. Mich. Jan. 23, 2019), *report and recommendation adopted by* 2019 WL 1349609 (E.D. Mich. Mar. 26, 2019). Furthermore, unlike in *Bialo*, there is no evidence the ALJ may have been at fault for failure to hold open the record or otherwise obtain these records. 2019 WL 2218798 at *5. In addition, unlike the case in *Bialo*, Holewinski admits she was aware of the missing records before filing her Complaint in this court. (Doc. No. 9 at 35.)

"pertain to Plaintiff's condition after the date of the ALJ's decision" and do not relate back in time. *Malanowksi*, 2014 WL 2593960, at *10.  Therefore, the evidence cannot be material.  *Id.*

As the Sixth Circuit has explained:

> "Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition." *Sizemore*, 865 F.2d at 712; *see also Ferguson*, 628 F.3d at 277-78; *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir.2003). "If in fact the claimant's condition had seriously degenerated, the appropriate remedy would have been to initiate a new claim for benefits as of the date that the condition aggravated to the point of constituting a disabling impairment." *Sizemore*, 865 F.2d at 712.

*Deloge v. Comm'r of Soc. Sec.*, 540 F. App'x 517, 519-20 (6th Cir. 2013).

For all the reasons set forth above, the Court finds Holewinski failed to meet her burden to prove a sentence six remand is warranted.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: September 20, 2022                     *s/ Jonathan Greenberg*
                                                         Jonathan D. Greenberg
                                                         United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**